**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

MELISSA GEMMEL,　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　No. CIV 04-198-TUC-CKJ
vs.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　**ORDER**
SYSTEMHOUSE, INC., et al.,　　　　 )
　　　　　　　　　　　　　　　　　)　　FINDINGS OF FACT AND
　　　　　Defendants.　　　　　　　)　　CONCLUSIONS OF LAW
　　　　　　　　　　　　　　　　　)

Pending before the Court are Plaintiff's Motion for ERISA Determination of Benefits [Doc. # 184] and Defendant's Motion for Judgment on the Administrative Record [Doc. # 178]. The parties have requested the Court schedule this matter for oral argument. The Court declines to schedule this matter for oral argument.

*Factual Background*

Melissa Gemmel ("Gemmel") obtained long term disability coverage under the Systemhouse Long Term Disability Plan ("Plan") through Gemmel's former employer Systemhouse, Inc.[1]

November 8, 1989, correspondence from P. William Haake, M.D., indicates that an

---

[1]The Court notes that, in her Motion for ERISA Determination of Benefits, Gemmel refers to Reliance Standard Life Ins. Co.'s denial and reinstatement of Gemmel's disability benefits. For purposes of this Order, the Court will use "Plan Administrator" as the acting entity.

MRI scan showed Gemmel suffered from osteophytes in the neural canal at C5-6, a posterior osteophyte at C5-6, and a C7-T1 abnormality. Administrative Record ("AR") 780.

On January 31, 1990, Zsolt G. dePapp, M.D., following an apparent referral by Gemmel's doctor, stated that he "suspect[ed] that with proper physical therapy, exercise and muscle relaxants, [Gemmel] could become more functional once again. [Dr. dePapp did not] think [Gemmel] realize[d] yet how much her inner tensions effect the operation of her nervous system and muscles." AR 814.

An October 1, 1993, preliminary report indicated that a Lumbar Spine MRI showed Gemmel had, *inter alia*, a small focal disc herniation at 5-1. AR 326.

On or about December 17, 1993, Gemmel filed for disability benefits. AR 415. Gemmel asserted that she had back problems and numbness in her leg. Gemmel supplemented her complaints, asserting that she suffered from constant headaches, degenerative disc disease, fibromyalgia, pain and numbness in left leg, back and neck, pain and swelling in hands and fingers due to carpal tunnel in both wrists, loss of range of motion with fingers and thumbs. AR 101-102.[2] On February 15, 1994, S. Mitchell Freedman, M.D., informed the Plan Administrator that he believed Gemmel had connective tissue disease characterized by fibromyalgia, osteoarthritis and Sjorgren's syndrome and that she was unable to work because of severe chronic pain. Gemmel's claim was reviewed and, on or about March 7, 1994, Gemmel's application for long term disability benefits was approved by the Plan Administrator. AR 240. The approval referenced a statement of James Carver Hill, M.D, Gemmel's treating physician, that he hoped she could return to work part-time in

---

[2]The AR includes a list prepared by Gemmel when she was 49 years old of diagnoses and conditions suffered by Gemmel. AR 490-492; *see also* AR 629-646. Additionally, Catherine Kapoor, M.D., summarized Gemmel's history of diagnoses and conditions on November 11, 1998. AR 521-523. Dr. Kapoor stated that "[i]t was quite clear from her history that the pain complaints were vastly more extensive than those which could be related to a lumbar disc herniation." *Id.*

1  2-4 months. *Id.*, AR 274.[3]  Periodically, the Plan Administrator requested updated medical

2  records from Gemmel's medical providers.  AR 553.

3      On or about April 25, 1994, Robert A. Eisenberg, M.D., conducted an independent

4  medical examination ("IME") on Gemmel.  AR 200-202.  Dr. Eisenberg diagnosed Gemmel

5  with fibromyalgia and stated that he could not judge whether Gemmel was able to work at

6  that time – he did not believe Gemmel was malingering.  AR 174-180 and 163.  A June 13,

7  1994, LTD Claim Screening Review stated Gemmel's condition as including radicular back

8  pain, fibromyalgia, spondylosis, and migraines.  AR142.  The consultant determined that

9  Gemmel suffered from a long-term disability.  *Id*.  Gemmel's 1994 and 1995 medical reports

10  from Dr. Hill include assessments of fibromyalgia, chronic pain, insomnia, migraines,

11  depression, and back pain.  AR 59-72; *see also*, AR 160.  Earlier records indicate Gemmel

12  had a history of such conditions.  *See* AR 252-354; AR 776-784.

13      A March 15, 1996, report from Michael D. Gwinn, M.D., indicated his conclusions

14  from an IME that Gemmel suffered from chronic pain and that psychological factors may be

15  contributing.  AR 362.  Dr. Gwinn further stated that, based upon the lack of objective

16  findings, Gemmel should be able to perform regular work for a person of her size and stature;

17  even if Gemmel was suffering from pain, Dr. Gwinn stated she was capable of sedentary

18  work.  AR 363.

19      On May 24, 1996, Dr. Hill advised the Plan Administrator:

20      In evaluating Ms. Gemmel's on-going disability, there seems to be inordinate weight
       given to the fact that Ms. Gemmel felt well enough to play 9 holes of golf in August
21      '95 – (my clinic note 8/18/95).  It is the nature of fibromyalgia that there will be some
       very good days and some very bad days (unable to turn over in bed without pain); but
22      lots of bad days where sitting behind the wheel for a 5 minute trip to the grocery stain
       (sic) is too painful.  However, Ms. Gemmel will have no predictable number of very
23      good days in any given month.  Obviously an individual can undertake no responsible
       work – no matter how physically undemanding it may be – if they cannot commit to
24

25          [3]An undated letter from Dr. Hill includes his opinion that, while Gemmel is not totally
26  incapacitated, she is totally disabled.  AR 1306.  Dr. Hill stated that any of Gemmel's
    diagnoses for depression, chronic pain, and fibromyalgia supports a finding of a permanent
27  disability. *Id.*

28                                                    - 3 -

working some definite number of hours each month. Employers with positions of low responsibility requiring little skill and training are usually not interested in developing individualized, flexible schedules. At this time I cannot recommend that Ms. Gemmel commit to even a flexible work schedule of any practical consequence.

AR 821.

In June 1996, Gemmel began to receive Social Security disability benefits effective September 2, 1993. AR 21 and AR 830-834. There is no evidence before the Court that Gemmel's status as to her continuing eligibility for Social Security disability benefits has changed.

On or about September 8, 1996, Norman N. Kohn, M.D., issued a report in which he stated that "Gemmel appears totally incapacitated by her subjective complaints." AR 793. Dr. Kohn also stated that Gemmel's "psychological factors separate from her fibromyalgia are significant factors in her disability for work." AR 795.

A November 1999 MRI indicated Gemmel suffered from multilevel degenerative disc desiccation and mild facet arthropathy at L45-5 and L5-S1. AR 502.

A February 2000 MRI showed Gemmel suffered from marked degenerative disc disorder at C5-6 with stenosis and small central disc protusion at C3-4. AR 524.

Jeff A. Benjamin, D.O. referred Gemmel for physical therapy. AR 468-469. The February 1, 2000, physical therapy intake evaluation indicated that Gemmel reported significant pain and Gemmel was assessed with cervical and lumbar pain. AR 470. On March 4, 2000, after two treatments per week for four weeks, Gemmel was discharged from physical therapy, with the registered physical therapist stating that Gemmel had "noted moderate relief with physical therapy noted by decrease in symptoms up to 75 %. However, [Gemmel] has had numerous personal problems that have aggravated her symptoms not related to physical therapy." AR 475. Gemmel was to continue the home program and follow up with her physician. *Id.* On March 28, 2000, Dr. Benjamin stated: "Neurologic exam history and physical does show [Gemmel] having an enormous amount of complaints that would be consistent with severe cervical lumbar strain most probably secondary to the

underlying degenerative changes seen on the MRI." AR 484. Dr. Benjamin also discussed Gemmel's fibromyalgia. *Id.*

A September 2000 MRI showed moderate degenerative disc disease with bilateral neural foraminal stenosis at C5-6 and central HNP C3-4. AR 529.

On February 15, 2001, in response to an inquiry from the Plan Administrator, Drs. Benjamin and George M. Sandoz, M.D., stated that they had not seen Gemmel since September 7, 2000. They further stated that Gemmel could stand, sit, walk, and drive for 3-5 hours out of an 8 hour day. AR 446. They also stated that Gemmel could not do any repetitive pushing or pulling, but that she could do repetitive grasping and fine manipulation. *Id.* Further, they stated that Gemmel could never climb, kneel, or crawl, but could occasionally bend at the waist, reach above her shoulder, and use foot controls and could frequently bend at the waist and squat at the knees. *Id.*

On April 11, 2001, James M. Coggin, M.D., stated:

> The disability determination was in place prior to our participation in her care. No available medical information has been elucidated to warrant any recommendation for change in her status. Overall pain has been reported as increasing, and objective indicators including decreased R.O.M., consistently positive trendelenberg tests, antalgic gait, assymetric S.L.R.'s, with marked left leg weakness, and multiple areas of upper and lower back tenderness, swell[i]ng and spasm on exam, correlate sufficiently to find the pain reports consistent and reasonable. There are time periods of the patient "feeling better", and this positive mood reflects well on her determination to survive her most unfortunate circumstances. Since the last written report to Ms. Voisine in October, 1998, the patient's overall condition has declined, based on both objective indicators as examined and reported, and subjective parameters including reported levels of pain, discomfort, and ambulation.

AR 1011.

Defendants assert that on April 20, 2001, the Plan Administrator undertook a routine review of the file by seeking an outside and independent peer review of all medical records. AR 1101 and 1393-1406. William Scott Hauptman, M.D., reviewed Gemmel's records and stated:

> **Dr. Haake concluded "this lady certainly has a bizarre set of symptoms.** I cannot say that all of her symptoms originate from the apparent degenerative disc with osteophyte formation at C5-6. She does not have any myelopathic signs."

AR 1394, *emphasis in original*. Dr. Hauptman further stated:

> Dr. Depapp documented "**she still has a lot of tension and stress. She now realizes the connection between her symptoms and the various stresses in her life.** It is sort of remarkable that everything started with the death of her father a number of years ago and it was exacerbated by the death of her mother last year. She is also troubled by a younger brother who is constantly being arrested for DWI and requesting her financial assistance. She relates an episode of shaking following an argument with her daughter, and another bad day following her stint in front of her computer where her muscles in her neck and back were extremely tight." **Therefore the medical records document clearly and early on the significant contribution and "connection" of psychological stress and the patient's symptoms.**

AR 1395. Dr. Hauptman also discussed Dr. Boone's findings:

> . . . Dr. Boone notes in fact that the very small subligamentous herniated disc at L5-S1 was in fact on the wrong side. **The patient's symptoms were on the left while the MRI findings were on the right.**

AR 1395, *emphasis in original*. Dr. Hauptman also summarized Dr. Freedman's observations and conclusions:

> On examination her cognitive function was normal. Cranial nerves were normal. She had full range of motion of the neck and full range of motion of the back. She had good strength proximally and distally in the arms and legs. Sensation, reflexes, balance and gait were basically normal. Dr. Freeman concluded "it is hard to say exactly why she is having so much back and left leg pain. I suspect this is really part of the fibromyalgia syndrome." Further studies performed by Dr. Freedman including visual evoked potentials, auditory evoked potentials, median somatosensory evoked potential and tibial somatosensory evoked potential were all normal.

AR 1395. Dr. Hauptman summarized Dr. Eisenberg's opinion:

> **Therefore the patient's physician, in a fashion similar to previous physicians, notes the connection between psychological issues and the patient's symptoms.**

AR 1396, *emphasis in original*. Dr. Hauptman summarized Dr. Gwinn's examination and conclusions:

> **In conclusion Dr. Gwinn documents that the patient did not appear to be in severe discomfort during the exam and "based upon my examination, there is no objective medical evidence to substantiate the presence of subjective complaints.**
>
> . . . Dr. Gwinn recommended a psychological evaluation and possible psychological testing to rule out a somatoform pain disorder and the possibility of an addictive personality. He notes however that the patient has refused according to the records psychological intervention.
>
> **Dr. Gwinn concluded "based upon the lack of objective finding, the patient should be able to perform regular work which is appropriate for a person of her size and stature . . . if in fact she is experiencing the pain that she expresses, then**

**I would say that she is capable of sedentary work, in which she can change positions as needed." Dr Gwinn concluded that the patient could stand, sit, walk and drive for 5-8 hours with breaks.**

AR 1397, *emphasis in original.* Dr. Hauptman further stated:

> I reviewed the results of the psychological independent medical examination performed by David Colvard, M.D. on November 29, 1996. This examination was truncated and therefore the assessment is inconclusive. Dr. Colvard placed the patient in a room to perform a computerized examination. Dr. Colvard documented "while she was completing the computerized tests, I observed her briefly through a partially open door. She was sitting stiffly watching the monitor and appeared to be tapping the space bar promptly and smoothly and comfortably without wincing with her right hand fingers in response to the letters on the monitor. I observed no trembling or shaking or visible emotional upset. When she finished I opened the door and walked in and she immediately began to tear up and when asked what was going on, she said she was crying out of frustration at not being able to do the test the way she could have before she became disabled."
>
> Dr. Colvard reviewed the medical records available to him including the disabilities determination evaluation by the psychiatrist, Dr. James Bellard. I do not have the report from Dr. Bellard available for your review. Dr. Colvard documents that Dr. Bellard concluded that the patient had depression secondary to a medical condition and he regarded her prognosis as very poor in light of her rigid denial of the presence of emotional factors in her presentation. Dr. Bellard also felt the patient also has a probable obsessive personality disorder. **Dr. Colvard's provisional diagnosis was a major depressive disorder, prolonged single episode, in partial remission temporally associated with multiple chronic pain syndromes.** Dr. Colvard documents that several physicians had suggested that the patient had depression and that she had had some response to antidepressants including Prozac and Zoloft.

AR 1398, *emphasis in original.* Dr. Hauptman also summarized other physicians' reports, including those of Dr. Coggin. Dr. Hauptman concludes, *inter alia*:

> The medical records document numerous extensive physical complaints which cannot be neatly characterized by a unifying diagnosis. The patient may have underlying fibromyalgia. However it is my opinion within a reasonable degree of medical certainty that even given the possible diagnosis of underlying fibromyalgia, the medical records do not support impairment from sedentary work.
>
> The medical records also clearly point to psychiatric disease in this patient. Numerous treating physicians have pointed to the patient's underlying psychiatric problems along with the significant contribution of the psychiatric issues to the patient's numerous somatic complaints. . .
>
> . . .
>
> As noted above it is my opinion within a reasonable degree of medical certainty that this patient is not impaired from sedentary work by her physical condition. The patient's physical condition and complaints existed prior to her date of disability of September 3, 1993. Therefore the medical records document that the patient was able to work in her sedentary capacity during time periods in which her physical

complaints were present.

AR 1403-1404. Dr. Hauptman's review included the following statement regarding Gemmel's receipt of Social Security disability benefits: "I reviewed the Social Security Administration notice of disapproved claim dated March 29, 1994. Subsequently this disapproval was overturned by an administrative judge." AR 1393. However, the assessment portion of Dr. Hauptman's review did not include any mention of the Social Security disability determination. AR 1403-1405.

On or about May 15, 2001, Gemmel was notified that her claim was terminated because the medical documentation did not support total disability. AR 1020-1022. On July 16, 2001, Gemmel appealed; Gemmel's claim was remanded by the Plan to reinstate benefits while further investigation was completed including an independent medical examination ("IME") to determine whether Gemmel's physical and/or mental problems rendered her totally disabled.

On October 19, 2001, Dr. Coggin wrote a letter to the Plan Administrator stating that Gemmel was disabled when she came to his clinic in 1994 and remained totally and completely disabled at her last visit. AR 1383. He further stated:

> [Gemmel's] condition in the intervening years has deteriorated; her pain has worsened; and her functional ability, that which remains, is limited. Disk degeneration has progressed at multiple levels overall and specific areas of pain are more numerous and more severe, and ambulation and general ROM (range of motion) are more limiterd (sic). this limited functional capacity does not include the ability to function in even a sedentary work environment.

AR 1383. Dr. Coggin's letter advised that he had been certified by the Disability Determination Service of North Carolina as a Physician Disability Examiner. *Id*. On October 26, 2001, Dr. Coggin stated in another letter:

> References to improvement in overall well-being, physical condition or pain control relate to the symptoms experienced by the patient. The underlying pathology causing these symptoms does not necessarily improve, nor change, because of a beneficial physical therapy session, an adequate medication regimen, or other therapeutic measures. Equating symptom control to improvement in underlying pathology is not necessarily appropriate for this or any patient. Also, any comments regarding good pain control are analogous to diabetics with good blood sugar control. A disabled patient with good pain control is still disabled, just as a diabetic with good blood

- 8 -

sugar control is still a diabetic. The times when the patient was "feeling better or "human again' or even able to have some activity outside of the home, do not necessarily translate into lack of pathology or a miraculous "cure", but, rather, indicate some effectiveness in symptom control.

AR. 1309. Dr. Coggin further stated:

The disc degeneration is real, the nerve root encroachment is real, and therefore, the subjective pain and dysfunction reported by the patient, both at the time and since, are believable and correspond with the pathology. No evidence of significant, nor lasting improvement has been demonstrated in my experience with the patient.

AR 1311. Dr. Coggin also referenced a "detailed report by a paid reviewer, who appears to have extracted a very well written report and chronological restating of selected excepts of the various medical reports over several years." AR 1311.

Dr. Hauptman stated in an undated Addendum:

. . . Dr. Coggin asserts that overall pain has been reported as increasing and is correlated sufficiently with physical examination findings. He reports that since October 1998 the patient's overall condition has declined based on both objective indicators and subjective parameters.

**This assertion by Dr. Coggin that the patient has continuously deteriorated is not consistent with the available medical records.**

As stated in my initial report of April 20, 2001, physical therapy records from Indigo Physical Therapy dated March 4, 2000 clearly document that the patient notes moderate relief with physical therapy and **a decrease in symptoms up to 75%**.

Additionally the medical record from Dr. Benjamin dated September 7, 2000 documents that with regards to the patient's numerous medications, the patient had weaned herself off of all of her medications except for Relafen. Therefore the patient had stopped numerous medications including Methadone, Valium, sleeping pills, Neurontin and Effexor. **Clearly the ability to decrease all of these medications is inconsistent with Dr. Coggin's assertion that the patient's condition had continued to decline.**

The ability of the patient to wean herself off these numerous medications is instead consistent with the improvement in symptoms documented by the Indigo Physical Therapy records.

AR 1390, *emphasis in original*.

In January and February of 2002, the Plan Administrator attempted to contact Gemmel to arrange for an IME. When Gemmel failed to make herself available for an IME, the Plan Administrator sent Gemmel a letter stating that she must comply with the request within 30 days. AR 962-63. On or about May 2, 2002, benefits were discontinued when Gemmel had

not responded to the Plan Administrator's request to conduct an examination. AR 959-961. Gemmel appealed and subsequently agreed to appear for an IME. AR 957 and AR 948.

The Plan Administrator reinstated Gemmel's disability benefits on January 31, 2003, but informed her that additional investigation was necessary.

April 2003 x-rays showed moderate to severe disc space narrowing at C5-6 and at multiple lumbar levels L2-L3, L3-L4, L4-L5, and L5-S1. The conclusion was focal degenerative disc disease at the C5-C6 level. Osteophytes were present at multiple levels and there was facet arthropathy, especially in the lower lumbar spine. The conclusion was degenerative disease of the lumbar spine. The T-14 ribs were noted to be either very small or nonexistent. There were degenerative arthritic changes in both hands. AR 1220-22, AR 1264-66, AR 1372-73, AR 1377, AR 1379.

In the summer of 2003, the Plan Administrator requested Gemmel to provide physicians' statements. Gemmel asserts that she sent information from Deborah Power, D.O., a board certified rheumatologist, who stated her opinion that Gemmel is permanently disabled and suffers from myofacial pain, fibromyalgia, degenerative disc disease, carpal tunnel syndrome, disorderd sleep, and osteoarthritis; Dr. Power also stated that Gemmel had decreased cervical range of motion, decreased strength in both hands, diffuse myofacial tender points and positive symptoms of carpal tunnel syndrome. AR 1242-48, AR 1283-95, AR 1313. Gemmel asserts she also sent information from Kim Charani, D.O., a board certified family physician who treats chronic pain patients, who stated that she believed Gemmel was disabled due to fibromyalgia with muscle pain and weakness, chronic back pain due to degenerative disc disease, anxiety, carpal tunnel syndrome, migraines and chronic fatigue; Dr. Charani also stated that Gemmel takes Methadone, Celebrex, Lyrica, Xanax and prednisone.[4]

---

[4]The Court has not located the document that includes these statements by Dr. Charani. However, Doc. #54, Ex. B, appears to corroborate Gemmel's assertion that Dr. Charani provided information.

An IME was scheduled for May 23, 2003, to be conducted by Vicki Berkus, M.D., Ph.D. AR 940.[5] When Gemmel appeared for the examination with a video camera, the receptionist asked Gemmel to turn the camera off. When Gemmel refused to turn the camera off, she was told she would not be seen. *Id*.[6] Defendants asserts Gemmel refused to leave until the police arrived. *Id*.[7] The IME did not take place. *Id*.

Gemmel submitted to a two day Functional Capacity Evaluation ("FCE") on January 22-23, 2004. AR 1139-1164. The FCE was conducted by Karen Lunda, P.T.[8] Lunda's report included a summary of Gemmel's medical issues. AR 1141-1146. Lunda noted multiple inconsistencies (e.g., "[Gemmel] exhibited greater spontaneous cervical and trunk rotation and cervical flexion range of motion than what she demonstrated actively during the physical exam and some of the ranges increased despite reports of increased pain." AR 1155), during the two days of testing. Lunda noted:

1. Active cervical motion was decreased and could be due to cervical pathology; however, the measurements were not consistent with pain reports and spontaneous movement was greater than tested movement.

2. Decreased active trunk extension could be related to the DDD.

3. Reported hip pain at end range of flexion, internal and external rotation is consistent with bursitis.

4. Soft tissue changes with trigger points are consistent with fibromyalgia.

[5]Gemmel asserts in her Motion for ERISA Determination of Benefits that the psychiatric exam by Dr. Berkus was to be part of the Functional Capacities Evaluation.

[6]Gemmel asserts in her Motion for ERISA Determination of Benefits that she brought the video camera with her because it was allowed by Ariz.R.Civ.P. 35.

[7]Gemmel asserts in her Motion for Summary Judgment that she visited Dr. Charani's office, located in the same medical plaza, after leaving Dr. Berkus's office pursuant to counsel's advise (to verify Gemmel's appearance and attire). The Court has previously determined it is not appropriate to consider this information.

[8]Gemmel points out that Lunda conducted an FCE for the claimant in *Clark v. Reliance Standard* and found the claimant totally disabled. Gemmel implies Lunda is biased in favor of the person/entity who hires her.

> 5.    The client exhibits some decreased sensation in the right thumb.  This is isolated to the thumb and does not include the normal median nerve distribution.

> 6.    The client lacks an ankle reflex on the right.  This is consistent with a R sided L5-S1 HNP.

AR 1157.  Lunda further stated:

> The client did not exhibit any specific pain behaviors.  As noted previously, the client ambulates with a deviated gait pattern.  This varied during the testing.  At times the client favored the left lower extremity a lot, at times a little and at other times not at all.

> Despite reporting increases in pain and/or numbness the client did not present to be in any physical distress and there were minimal objective signs and symptoms to substantiate the pain complaints during functional testing. Except for the standing and walking tests, there was not a change in the manner in which the client performed the activity, a change in body mechanics, muscle recruitment, change in the soft tissue etc. [The client rated her pain.]

AR 1157-1158.[9]  Lunda also stated:

> The following [physical capabilities required to perform sedentary work] were identified:

> > 1.    Maximum push requiring 51 lbs of force to initiate movement.

> > 2.    Maximum pull requiring 59 lbs of force to initiate movement.

> > 3.    Good tolerance for forward bending in sitting and static sitting.

> > 4.    Good fine motor/manual dexterity skills.  The client scored 95 on the right and 86 on the left.  Average score falls between 70 and 100.

> > 5.    Able to lift and carry 10 lbs.

AR 1158.[10]  Lunda also stated:

---

[9]Gemmel points out that the report indicates that she fell when trying to stand from a squatted position and that she nearly fell when attempting to flex her torso to the left.

[10]As to Lunda's conclusion that Gemmel can lift and carry at least ten pounds, Gemmel points out that the report also includes reference to the fact that, when Gemmel was asked to lift six pounds, Gemmel reported pain radiating down the sides of her legs.  AR 1220 Gemmel asserts the report further indicates that Lunda then had Gemmel lift 11 pounds asked how Gemmel felt, to which Gemmel replied that she wanted to lay down.  Defendant asserts that the FCE report states that Gemmel preferred to continue and subsequently carried 11 pound 50 feet without distress.  Gemmel also points out that her range of motion

. . . The client did limit some of the activities by a report of pain and/or numbness. As noted previously, there were minimal objective changes to correlate with the subjective reports.

AR 1158. Lunda also stated Gemmel could:

1.   Lift and carry at least 10 lbs.

2.   Pushing which requires 51 lbs of force to initiate movement and pulling which requires 59 lbs of force to initiate movement.

3.   Gripping, pinching, fine motor/manual dexterity work and sitting could be performed on a continuous basis.  Regular position changes should be allowed for sitting.

4.   The client can stand for at least 8 minutes at a time and at least up to 33% of a workday.

5.   The client can walk for at least 5 minutes at a time and cover a distance of at least 500 ft and at least up to 33 % of a work day.

6.   The client can perform bending and twisting on a regular basis.

AR 1158-1159. Lunda also stated that "[Gemmel] does move with slow pacing.  Self-pacing may need to be allowed."  AR 1159.  A form completed by Lunda indicates that Gemmel can work at least at a sedentary lift exertional level.  AR 1162.

Gemmel also states that the discontinuance of benefits relied on a two day FCE that purported to observe first hand her ability to engage in normal, everyday activities.  Gemmel points out that the FCE does not measure her ability to function as an employee working at least 8 hours per day, 5 days per week.  The FCE shows Gemmel functions with about one-half of the average person's range of motion and cannot lift and carry ten pounds safely.  Further, Lunda did not observe Gemmel working at a computer and did not watch Gemmel ascend or descend stairs – Gemmel asserts that putting nuts on washers and flipping wooden boxes does not show if Gemmel has the ability to write computer instructions, create

("ROM") decreased as the days processed and were significantly below normal (e.g., should ROM is about 30 % lower than that of the average person).  Defendant asserts that Gemmel's apparent argument that Lunda was cherry-picking data is no more helpful than if Defendant were to argue that Gemmel, motivated by her own self-interest, may have limited her ROM to affect the results.

databases, or supervise other employees.[11]

On February 20, 2004, Steven J. Feagin, M.D., after reviewing Gemmel's records, concluded:

a)   Primary psychiatric impairment

    i)   Multifaceted though with a strong somatization component

    ii)   Unclear level of related impairment and therefore poorly delineated restrictions and limitations secondary to the psychiatric disease

b)   Multitude of self-reported conditions allegedly causing impairment

    i)   Lack of corroboration of the self-reports from the pathology that has been objectively demonstrated

    ii)   Objectively demonstrated capacity for at least full-time sustainable sedentary work endeavors via formal functional capacity testing

    iii)   Likely capacity beyond sedentary though unproven due to the sedentary restrictions on the testing performed, though maximal capacity has not been assessed

AR 1166.   In reaching these conclusions, Dr. Feagin discussed contradictory and/or unsupported conclusions of Gemmel's physicians (*e.g.*, "[Gemmel's] physicians raise the possibility of firbromyalgia (FM or FMS) in spite of the fact that it is unclear if there is sufficient data to even apply the ACR criteria for firbroyalgia" AR 1167; lack of supporting data for headaches.  AR 1168), that Gemmel had a history of neck and possible radicular complaints and worked in spite of those complaints, AR 1167, Gemmel's degenerative disc disease, history of carpal tunnel syndrome, headaches, trigeminal neuralgia, chronic heartburn, abdominal pain with irritable bowel syndrome, chronic fatigue syndrome, multifaceted psychiatric disease, history of rhinitis and sinusitis, and hyperlipdemia.  AR

---

[11]Gemmel also asserts that the FCE does not show that she can perform everyday activities (e.g., washing clothes, doing dishes, grocery shopping). Gemmel asserts she cannot perform these activities.  Gemmel also states that Lunda does not note that the FCE was conducted while Gemmel was under the influence of narcotics, nor did Lunda contact Gemmel after the second day of the FCE to inquire about any effects of the FCE on Gemmel. Gemmel has not pointed to any document in the AR that establishes this lack of ability to perform everyday activities.

- 14 -

1166-1171. Dr. Feagin's review did not include any discussion of Gemmel's receipt of Social Security disability benefits. *See* AR 1166-1171. Gemmel points out that Dr. Feagin, an internist, is not a pain specialist, rheumatologist, neurologist, nor a spinal disorders expert. Gemmel also asserts that Dr. Feagin's report is not independent because it was obviously tainted by Dr. Hauptman's speculations, inferences, and dismissive tone towards the reports of Gemmel's treating doctors.[12]

An investigator observing Gemmel's residence on February 17-19, 2004, failed to see any activity by Gemmel. AR 1043-1044. It was reported to the Plan Administrator that Gemmel had come to the door wearing a bathrobe and that there was a sign on the door to ring twice since she was ill. AR 1111.

On March 1, 2004, correspondence was sent to Gemmel (via counsel) upholding the denial of benefits. AR 1100-1106.

On January 13, 2005, Dr. Charani stated that she believed Gemmel's "primary diagnosis is physical with her mental issues, most likely, as a result of her physical problems." Doc. # 54, Ex. B. Dr. Charani also noted that the FCE failed to consider how consistently Gemmel might be able to work. *Id.*

On January 25, 2005, Dr. Power stated that she believed Gemmel to be totally and permanently disabled from any type of work and that her primary diagnosis was a physical condition. Doc. # 54, Ex. B. Dr. Power, disagreeing with Lunda's conclusion that Gemmel

---

[12]Gemmel argues that Drs. Hauptman and Feagin do not explain why they decided her emotional conditions were the primary cause of her disability when there were no records of psychiatric care or when there were no records of a miraculous cure. Further, they do not explain why the opinions of Drs. Coggin, Charani, and Powers were not adequately considered. Gemmel also argues that the Plan Administrator did not consider the cumulative effect of Gemmel's physical and cognitive disabilities (i.e., the effect of her working at a keyboard day after day). Additionally, there is no inquiry into whether Gemmel could safely travel to and from a job (i.e., consideration of safely driving, walking or climbing stairs). Additionally, Gemmel asserts neither Hauptman or Feagin had the entire file for their reviews. *See e.g.,* AR 1063.

can consistently and reliably work, stated, "Given the multiple diagnoses and worsening of the lumbar spinal stenosis combined with Fibromyalgia Syndrome, I do not believe Ms. Gemmel could work for more than 2 hours once a week." *Id.*

*The Long Term Disability Plan ("Policy")*

The Policy provides that, in the event of disability, as defined by the Policy, an insured is entitled to a monthly benefit "in an amount equal to 60% of Covered Monthly Earnings" to age 65. AR 549. The Policy defines disability as follows:

"Totally Disabled" and "Total Disability" mean that as a result of Injury or sickness:

> (1)    during the Elimination period and for the first 60 months for which a Monthly Benefit is payable, an insured cannot perform the material duties of his/her regular occupation. We consider the Insured "Totally Disabled" if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis; and

> (2)    after a Monthly benefit has been paid for 60 months, and Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow.

AR 551. The Policy is subject to certain limitations, including:

> Monthly benefits for Total Disability due to mental or nervous disorders will not be payable beyond twenty-four (24) months unless the Insured is in a Hospital or Institution at the end of the twenty-four (24) month period.

AR 559. Additionally, the Policy provides:

> We will, at our expense, have the right to have a Claimant interviewed and/or examined:

> (1)    physically;

> (2)    psychologically;

> (3)    psychiatrically[.]

AR 553.

. . . . .

. . . . .

*Procedural Background*

On February 23, 2006, Gemmel filed a Second Amended Complaint against Systemhouse, Inc., MCI Worldcom Network Services, Inc., Electronic Data Systems, EDS/SHL Corporation, Systemhouse Long Term Disability Plan, and Reliance Standard Life Insurance Company. Gemmel alleged that she was an insured and a beneficiary under the Systemhouse Long Term Disability Plan administered under the Employee Retirement and Income Security Act, 29 U.S.C. § 1101, *et seq*. ("ERISA"). She further alleged that the benefits plan was issued to and delivered by Gemmel's former employer, Systemhouse, Inc., and administered by Systemhouse, Inc. and/or Reliance Standard Life Insurance Company pursuant to ERISA.

Gemmel alleged that her benefits were denied and terminated despite her continuing disability and in violation of ERISA. She further alleged that although some disability benefits were paid for a time, proper disability benefit amounts were not paid. Gemmel requested the Court to declare the rights, status and other legal relationships between the parties hereto and requests the Court to declare the Systemhouse Long Term Disability Plan affords coverage for benefits for Gemmel beyond the arbitrary termination date of November 2, 2003, pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3).[13]

Following procedural delays, Defendant Systemhouse Long Term Disability Plan filed an Answer. Subsequently, the parties filed dispositive motions. Responses and replies have been filed. The Court has determined that a bench trial on the Administrative Record is appropriate.

---

[13]The Court notes that, in her Response to the Motion for Judgment on the AR, Gemmel asserts the parties disagree on the date of the termination of the benefits. However, the briefs of the parties indicate that the parties agree that the relevant date is March 1, 2004. The Court will review the AR to determine whether Gemmel has established that she met the definition of total disability as of March 1, 2004.

*Standard of Review*

A district court is to review *de novo* an ERISA plan administrator's decision to deny benefits "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 103 L.Ed.d 80, 109 S.Ct. 948 (1989); *Kearney v. Standard Life Ins. Co.*, 175 F.3d 1084, 089 (9th Cir. 1999); *Dytrt v. Mountain State Tel. & Tel. Co.*, 921 F.2d 889, 894 (9th Cir. 1990). The parties agree that the standard of review in this case is *de novo*.

*Burden of Proof*

An insured bears the burden of establishing her entitlement to plan benefits by proving that she met the definition of total disability at the time of the termination of benefits. *See e.g. Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992); *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1048 (11th Cir. 1998); *Jordan v. Northrop v. Grunman Corp. Welfare Benefit Plan*, 63 F.Supp.2d 1145, 1155 (C.D.Cal. 1999) (plaintiff bears the burden of proving an entitlement to ERISA plan benefits and cannot shift the burden to the plan administrator to "disprove" an alleged disability). Indeed, when reviewing the termination of disability benefits award under a *de novo* standard of review, an insured retains his or her burden of proving disability. *Schwartz v. Metropolitan Life Ins. Co.*, 463 F.Supp.2d 971, 982 (D. Ariz. 2006) ("Plaintiff has the burden of proof to show that he was eligible for continued long term disability benefits based on the terms and conditions of the ERISA plan."). In a trial on the administrative record, the Court "can evaluate the persuasiveness of conflicting testimony and decide which is more likely true." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999). Gemmel, therefore, has the burden to establish that she met the definition of total disability at the time of the termination of benefits.

*Total Disability*

The parties disagree as to whether a partial disability after the first five years constitutes total disability. As previously stated, the Policy defines disability as follows:

"Totally Disabled" and "Total Disability" mean that as a result of Injury or sickness:

> (1) during the Elimination period and for the first 60 months for which a Monthly Benefit is payable, an insured cannot perform the material duties of his/her regular occupation. We consider the Insured "Totally Disabled" if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis; and

> (2) after a Monthly benefit has been paid for 60 months, and Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow.

AR 551. Gemmel refers to a different definition of "Totally Disabled" and "Total Disability," citing to page 57. Gemmel's Motion for Summary Judgment [Doc. # 184], p. 10. Presumably, Gemmel is referring to the 1998 Plan Handbook, which states, at page 57:

> If you are unable to perform the tasks of your position because of a disabling illness or injury for the 90-day elimination period and up to five years after that time, you are considered "totally disabled." You are still considered totally disabled if you can perform the duties of your position on a part-time basis.

> After the first five years, total disability means that you are unable to perform the duties of any job for which you are qualified on the basis of education, training, or experience.

AR 542.[14]

"Under the federal common law of ERISA, [courts] interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence

_____

[14]Defendant has supplemented the AR with Systemhouse Employee Benefits Handbook. This document is not dated, but it contains the same quoted language as the 1998 Handbook as set forth at AR 542. *See* Doc. # 170, SHP 32. Defendant, in its Reply to Motion for Judgment on the AR, asserts that Gemmel has not provided the document to Defendant; therefore, Defendant cannot confirm the language or authenticity. The Court notes that the language provided by Gemmel is the same as in the two Handbooks discussed herein (The Court notes there are differences in capitalization and paragraph breaks). There not appearing to be a material difference between the Handbooks and Gemmel's language, the Court will collectively refer to them as the "Handbooks."

and experience." *Padfield v. AG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir.), *internal citation and quotations omitted*, *cert. denied*, 537 U.S. 1067 (2002). The terms of the Policy and the Handbook specifically treat an insured differently after 60 months. This provision is in a separate subsection in the Policy and in a separate paragraph in the Handbook. The Court finds that, under the Policy, Gemmel must establish that, after five years, she was unable to perform the duties of any job for which she was qualified on the basis of education, training, or experience.

Defendants argue that the "language of the 'any occupation' standard is not demanding." *McKenzie v. General Telephone Co. of California*, 41 F.3d 1310, 1317 (9th Cir. 1994), *overruled on other grounds*. In *McKenzie*, the plan provided that a person was disabled if he was "completely unable to engage in any and every duty pertaining to any occupation or employment for wage or profit for which you are or become reasonably qualified by training, education or experience." 41 F.3d at 1313, n. 2. The *McKenzie* plan was interpreted to mean what the plan said: a claimant was not disabled if he could perform any job for which he was qualified by training, education, or experience. 41 F.3d at 1317. Defendant asserts that the Plan is this case is similar and that sufficient evidence shows that Gemmel could perform other occupations for which she was reasonably qualified by training, education or experience.

Gemmel asserts that the jobs that the Plan Administrator submitted as appropriate for her failed to consider data from the FCE, did not consider potential employers and jobs that took into account her need for a slow or self-paced environment, and did not consider the fact that Gemmel had been out of the job market for ten years. Defendant asserts, however, that it is not required to provide identifiable and available job openings. *See Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1309 (5th Cir. 1994) (plan was "not a form of employment insurance[;]" administrator did not have to "insure the availability of an alternative job" prior to terminating benefits); *Block v. Pitney Bowes, Inc.*, 705 F.Supp. 20 (D.D.C. 1999), *aff'd* 952 F.2d 1450 (D.C. Cir. 1992) ("When a plan does not specifically state that the employer has

the duty of ensuring the availability of an alternative job, the court cannot impose such a requirement."). Even if the Plan required actual availability of employment, Gemmel would carry the burden of showing no such occupation was reasonably available. *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (plaintiff suing to recover contractual benefits under ERISA "bears the burden of proving his entitlement" to those benefits). The Court finds the Plan does not have the responsibility to show actual availability of employment.

Furthermore, "[t]hat a person has a true medical diagnosis does not by itself establish disability." *Jordan v. Northrop Grumman Corp. Welfare Benefit*, 370 F.3d 869, 880 (9th Cir. 2004), *abrogated on other grounds*. The issue before this Court is not whether Gemmel has been diagnosed with any specific conditions, but whether she was physically capable of performing the duties of any job for which she was qualified on the basis of education, training, or experience. Further, any occupation or job includes part-time work. *Brigham v. Sun Life Canada*, 917 F.3d 72, 83-84 (1st Cir. 2003) ("any occupation" standard means physically unable to work, even on a part-time basis); *Bond v. Cerner Corp.*, 309 F.3d 1064, 1067 (8th Cir. 2002) (claimant's part-time work precluded claimant from establishing that she could not continuously perform the substantial and material duties of any occupation); *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 186 (1st Cir. 1998); *Shane v. Albertson's Inc. Employees' Disability Plan*, 381 F.Supp.2d 1196, 1206 (C.D.Cal. 2005) (employee who could work part time was not totally disabled).

*De Novo Review*

The medical records establish that Gemmel has a history of a myriad of physical conditions. This includes MRI results that show Gemmel suffered from osteophytes in the neural canal at C5-6, a posterior osteophyte at C5-6, and a C7-T1 abnormality, AR 780, a small focal disc herniation at 5-1, AR 326, multilevel degenerative disc desiccation and mild facet arthropathy L45-5 and L5-S1, AR 502, marked degenerative disc disorder at C5-6 with

stenosis and small central disc protusion at C3-4, AR 524, moderate degenerative disc disease with bilateral neural foraminal stenosis C5-6 and central HNP C3-4, AR 529. Further, x-rays have shown moderate to severe disc space narrowing at C5-6 and at multiple lumbar levels L2-L3, L3-L4, L4-L5, and L5-S1. The conclusion was focal degenerative disc disease at the C5-C6 level. Osteophytes were present at multiple levels and there was facet arthropathy, especially in the lower lumbar spine. The conclusion was degenerative disease of the lumbar spine. The T-14 ribs were noted to be either very small or nonexistent. There were degenerative arthritic changes in both hands. AR 1220-22, AR 1264-66, AR 1372-73, AR 1377, and AR 1379. Subsequent x-rays resulted in the conclusion that Gemmel suffered from focal degenerative disk disease at the C5-C6 level, AR 1264, and degenerative disease of the lumbar spine, AR 1265.

Furthermore, the medical records establish that Gemmel's diagnoses include radicular back pain, fibromyalgia, spondylosis, migraines, chronic pain, insomnia/disordered sleep, depression, cervical and lumbar pain, myofacial pain, degenerative disc disease, carpal tunnel syndrome, and osteoarthritis. AR142, AR 59-72, AR 160, AR 252-354, AR 776-784, AR 470, AR 1242-48, AR 1283-95, and AR1313. Indeed, on March 28, 2000, Dr. Benjamin stated that Gemmel's "[n]eurologic exam history and physical does show [Gemmel] having an enormous amount of complaints that would be consistent with severe cervical lumbar strain most probably secondary to the underlying degenerative changes seen on the MRI." AR 484. Moreover, Dr. Gwinn, after conducting an IME, determined that Gemmel suffered from chronic pain.[15] AR 362.

Drs. Hill, Coggin, Power, and Charani have opined that Gemmel is unable to work and/or is disabled. AR 821, AR 1383, Doc. # 54, Ex. B and C. Furthermore, Dr. Coggin discussed Gemmel's deteriorating condition. AR 1383, AR 1309, and AR 1311. Additionally, Dr. Eisenberg has expressed an opinion that Gemmel was not malingering. AR

---

[15]Dr. Gwinn did state that psychological factors may be contributing.

- 22 -

174-180 and AR 163.

However, there is evidence that Gemmel can perform sedentary work. Dr. Gwinn stated that, even if Gemmel was suffering from pain, she was capable of sedentary work. AR 363. Lunda concluded after the FCE that Gemmel possessed physical capabilities that are required to perform sedentary work (e.g., maximum push requiring 51 lbs of force to initiate movement, maximum pull requiring 59 lbs of force to initiate movement, good tolerance for forward bending in sitting and static sitting, good fine motor/manual dexterity skills, and able to life and carry 10 lbs). AR 1158. However, Lunda did also state that "[Gemmel] does move with slow pacing. Self-pacing may need to be allowed." AR 1159.

Defendant argues that, in considering whether Gemmel was disabled on March 1, 2004, it is appropriate to rely on the FCE because it shows Gemmel's abilities near the date of termination of the benefits (the FCE was conducted on January 22-23, 2004). *See Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004) (reasonable for plan administrator to rely upon an FCE as evidence supporting a determination that claimant did not meet plan's definition of disability); *Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 888 (8th Cir. 2002) (noting that an FCE's determination that claimant could do light work was enough to constitute substantial evidence for denial of benefits). The Court agrees that the FCE is entitled to significant weight. However, the Court also considers that Lunda recognized that Gemmel's abilities may need to be restricted by self-pacing. This, in and of itself is a limitation on Gemmel's ability to perform the material duties of any occupation. Additionally, the Court considers that the FCE shows that Gemmel's abilities are limited and, as the days' examination periods progressed, Gemmel's reports of difficulties increased. Further, the FCE took place over 4 hours, 10 minutes, on the first day and 2 hours, 55 minutes on the second day, "so the FCE test results do not necessarily indicate [Gemmel's] ability to perform sedentary work for an eight (or even four-) hour workday, five days a week. Even if the results of the FCE had shown conclusively that [Gemmel] could perform sedentary tasks for the duration of the test . . . those results provide no evidence as to her

abilities for a longer period." *Stup v. UNUM Life Ins. Co. of America*, 390 F.3d 301, 309 (4th Cir. 2004).

Additionally, the Court considers that an investigator observing Gemmel's residence on February 17-19, 2004, failed to see any activity by Gemmel. AR 1043-1044.[16]

Similarly, Defendant asserts that Dr. Feagin's February 20, 2004, report supports a conclusion that Gemmel is able to perform the duties of any occupation. The Court agrees this report is entitled to significant weight. The Court considers that Dr. Feagin discussed contradictory and/or unsupported conclusions of Gemmel's physicians (*e.g.*, "[Gemmel's] physicians raise the possibility of firbromyalgia (FM or FMS) in spite of the fact that it is unclear if there is sufficient data to even apply the ACR criteria for fibroyalgia" AR 1167; lack of supporting data for headaches. AR 1168.). However, the Court also considers that Dr. Feagin recognized Gemmel's degenerative disc disease, history of carpal tunnel syndrome, headaches, trigeminal neuralgia, chronic heartburn, abdominal pain with irritable bowel syndrome, chronic fatigue syndrome, multifaceted psychiatric disease, history of rhinitis and sinusitis, and hyperlipdemia. AR 1166-1171.

In considering Dr. Feagin's opinion that it is unclear if there is sufficient data to even apply the ACR criteria for fibromyalgia, the Court considers that Gemmel's treating physicians disagreed. *See e.g., Duvall v. Reliance Standard Life Ins. Co.*, — F.Supp.2d —, 2009 WL 2488179 * 13 (E.D.Cal. 2009) ("In *Nord*, the Court held that the presumption in Social Security cases that treating physicians' opinions must be given deference does not apply in the ERISA context. Nonetheless, it seems to this court not to be irrelevant when the insurer reviews the record made by the plaintiff's doctors but comes to a contrary opinion."). Indeed, Dr. Feagin's report does not seem to acknowledge the progressive deterioration of

---

[16]This "snapshot" only shows that Gemmel could not or would not perform any activities on those dates. While the Court does not place significant weight on this fact, the Court recognizes that, had the investigation shown activity, such activity may have corroborated Defendant's claims that Gemmel was able to perform sedentary work.

Gemmel's condition – Dr. Feagin noted that Gemmel had been able to work despite her history of neck and possible radicular complaints and did not adequately consider the deteriorating condition after that time. The Court notes that Dr. Feagin had reviewed Dr. Hauptman's report which included a conclusion that Dr. Coggin's assertion that Gemmel had continuously deteriorated was not consistent with the medical records (Dr. Hauptman had referred to Dr. Coggin's assertion that Gemmel had reported that overall pain was increasing and that this correlated to physical examination findings). It is not clear if Dr. Feagin concluded that Gemmel's condition was improving or simply remained stable. Without a reasonable conclusion that Gemmel's condition had improved, the Court cannot simply discount the historic findings and conclusions of Gemmel's treating physicians. Similarly, the Court does not discount that the Plan Administrator previously agreed that Gemmel was disabled. Moreover, the Ninth Circuit has recognized that it may not be appropriate to disregard the SSA's determination of disability. *Montour v. Hartford Life & Acc. Ins. Co.*, — F.3d —, 2009 WL 2914516 *10 (9th Cir. 9/14/09). In evaluating the reviewing physicians' opinions, the Court considers that they did not take into account that Gemmel was receiving Social Security disability benefits.

Additionally, the Court considers that Drs. Hill, Coggin, Power, and Charani have all opined that Gemmel was unable to work and/or was disabled.[17] In considering this evidence, the Court notes that the U.S. Supreme Court held that plan administrators "are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123 S.C.t 1965, 155 L.Ed.2d (2003). However, the Court did not hold that greater weight could not be accorded to the opinions of treating physicians if the facts of a particular cases warranted it. In this case, not only did the

---

[17]While the Court is not required to afford special deference to the submissions of a treating physician than to other reliable evidence, *Nord*, 538 U.S.at 834, the Court does find as significant that Dr. Coggin has been certified by the Disability Determination Service of North Carolina as a Physician Disability Examiner. AR 1383.

numerous treating physicians of Gemmel's opine that she was unable to work and/or was disabled, but, as treating physicians, these doctors were able to observe any relationship between Gemmel's medical diagnoses and mental issues.

However, in considering the evidence before the Court, the Court considers the necessary reliance doctors must place on Gemmel's credibility in reporting her pain. Indeed, Defendant argues that any indication of character for truthfulness is highly probative in evaluating a plaintiff's subjective reports of pain:

> [M]uch medical evidence, especially as it relates to pain, is inherently "subjective" in that it cannot be quantifiably measured. Indeed, the only evidence of a qualifying disability may sometimes be the sort of evidence that [defendants] characterize as "subjective," such as physical examinations and medical reports by physicians, as well as the patient's own reports of his symptoms.

*Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1196 (11th Cir. 2007), *vacated in part on other grounds*. Defendant asserts the AR contains several documents that confirm Gemmel's character for truthfulness is poor:

1.     Dr. Feagin's opinion that Somatization disorder is "[t]he major issue in the claimant's medical court over the last 10+ years . . ." and that "[o]ne must therefore question the possibility of intentional manipulation on the part of the claimant[.]" AR 1171.

2.     Gemmel's cover letter to Dr. Power requesting that medical information from any physician other than Dr. Power not be released despite the accompanying signed medical release that did not limit the scope of the release. AR 1301 and AR 1314.

3.     Gemmel's medical record of Physicians Immediate Care Center, Cary, North Carolina dated October 14, 1993, which included the handwritten note "10-14-93 Pharmacist called because pt. altered Rx refill numbers[.]" AR 292; *see also* AR 613.

4.     Gemmel's medical record of Family Medical Center, Sanford, North Carolina dated September 6, 1995, which includes a statement referencing Gemmel's "recurrent legal problems . . . ID (using deceased friends ID)[.]" AR 61.

5.     Gemmel's prior misdemeanor conviction for forgery.

These incidents bring into question whether Gemmel's reports of pain were accurate. However, the Court also considers that at least one doctor has specifically made a finding that he did not believe Gemmel was malingering and other doctors have concluded that the reports of pain are consistent with the medical findings.

Considering Lunda's and Dr. Feagin's reports, Gemmel's medical history, Gemmel's receipt of Social Security benefits, Gemmel's credibility, the Plan Administrator's prior determination of disability, and additional documentation before the Court, the Court concludes that, at the time of the termination of the benefits, Gemmel was unable to work in any occupation that her education, training or experience would reasonably allow.

However, under the terms of the Policy, termination of benefits was appropriate if Gemmel's disability was attributed to psychological causes.[18]  Defendant points to Dr. Feagin's conclusion that Gemmel's condition was the result of primary psychiatric impairment. Dr. Feagin also concluded that there was an unclear level of related impairment and therefore poorly delineated restrictions and limitations secondary to the psychiatric disease. However, Dr. Feagin's report does not explain how or why he concludes that the primary impairment was psychiatric. While many doctors had indicated that psychiatric factors contributed to Gemmel's impairment, there is no report from a treating physician before the Court that establishes that the psychiatric impairment is the primary cause.[19]

_____

[18]There is evidence in the AR that Gemmel's disability may be the result of psychiatric disease.  Gemmel's own treating physicians have expressed concern regarding the contributing nature of psychiatric factors.  *See* AR 814, AR 793 and AR 795.  Additionally, the reviewing doctors concluded any disability was psychiatric in nature.  AR 1394-1404 and AR 1166-1171.

[19]For example, Dr. Colvard's provisional diagnosis was a major depressive disorder, prolonged single episode, in partial remission temporally associated with multiple chronic pain syndromes.  This provisional diagnosis does not establish that the primary impairment was psychiatric.  Similarly, Dr. Hauptman's review recognized that numerous treating physicians had pointed to the patient's underlying psychiatric problems along with the significant contribution of the psychiatric issues to the patient's numerous somatic

Rather, Dr. Feagin's conclusion appears speculative. In light of the medical history of physical impairments, the Court finds it just as likely, if not more likely, that the psychiatric impairment is the result of the physical impairments.[20] The Plan does not specify what is to happen if a disorder is only partially attributable to mental illness. Therefore, the Plan must be construed to mean that, if there is a verifiable physical component to the impairment, the Plan's 24-month limitation does not apply and benefits are payable. *See Padfield*, 290 F.3d at 1125; *see also Gunn v. Reliance Standard Life Ins. Co.*, 592 F.Supp.2d 1251 (C.D.Cal. 2008) (where applicable language of plan included 24-month limitation as to disability "due to" mental or nervous disorder, as opposed to "caused by or contributed to by mental or nervous disorder," limitation did not apply unless inability to work was solely attributable to mental disorder). The Court finds Gemmel's disability is not solely attributable to a mental disorder and that, therefore, Gemmel was entitled to disability benefits on the date of the termination of her benefits.

*Re-Calculation of Benefits*

Gemmel requests that her benefits be recalculated to include a yearly bonus amount. Defendant has not objected to this recalculation. To the extent Gemmel is requesting that the yearly bonus be included in the calculation, the Court will grant this request. However, to any extent Gemmel is seeking to have this Court compute the calculation, the request will be denied. The Court will direct the Plan to reinstate Gemmel's disability benefits pursuant to the terms of the Policy and consistent with this Order.

complaints. Dr. Hauptman did not discuss any treating physician who concluded psychiatric issues were the primary impairment.

[20]While Gemmel could have sought and provided psychiatric records to establish that the primary impairment was not psychiatric, Defendant could have insisted on a psychiatric IME to present relevant evidence to the Court. The Court notes that Gemmel's benefits were not terminated because of her alleged refusal to complete an IME; the issue before the Court is whether Gemmel could perform any occupation at the time of the termination of benefits.

Gemmel also objects to the Plan Administrator's deduction from her benefits for Social Security and requests that her benefits be recalculated. Defendant asserts that a disability insurer can recoup overpayments resulting from an award of Social Security Disability Benefits and that a Plan's entitlement to recoup disability benefit overpayments has been upheld by numerous court. *Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279 (9th Cir. 1990); *Lake v. Metropolitan Life Ins. Co.*, 73 F.3d 1372 (6th Cir. 1996). The Court finds that Gemmel has not established that recalculation of the benefits on this basis is appropriate.

*Life Insurance*

Gemmel requests her coverage for basic and optional life insurance be reinstated. The Court notes that the Amended Complaint in this action seeks the "benefits due to Plaintiff[.]" Amended Complaint, Doc. # 77, p.3. The Handbook provides that basic and optional life insurance coverage is provided if a claimant is totally disabled. *See* SHP 26-28. The Court finds it appropriate to order the Plan to provide the basic and optional life insurance coverage as set forth in the Handbook.

*Attorneys' Fees*

Gemmel seeks an award of attorneys' fees. Defendant asserts that, as a *pro se* plaintiff, Gemmel is not entitled to attorneys' fees. *Kay v. Ehrler*, 499 U.S. 432, 435-37 (1991). Further, Defendant asserts that the request is procedurally and substantively premature.

The Court agrees with Defendant that Gemmel's request, in her Motion for ERISA Determination of Benefits, is procedurally and substantively premature. The Court declines to determine, at this time, whether Gemmel is entitled to an award of attorneys' fees for fees incurred in this litigation prior to Gemmel's *pro se* status. The Court advises the parties that she will entertain a separate motion for attorneys' fees and costs.

*Prospective Relief*

Gemmel requests this Court to not only determine that she was entitled to benefits at the time of her termination, but she appears to be requesting this Court to enjoin Defendant from ever terminating her benefits. She further objects to a "remand" for a determination of benefits. While the Court agrees that the cases cited by Gemmel do not support a remand for determining whether benefits from the date of termination is appropriate, *see Pannebecker v. Liberty Life Assur. Co.*, 542 F.3d 1213 (9th Cir. 2008), *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775-76 (7th Cir. 2003), *DiLisle v. Sun Life Assur. Co.*, 558 F.3d 440 (6th Cir. 2009), those cases do not support a determination that this Court has the authority to order future benefits.

Defendant asserts that this court may only "find that Gemmel's *coverage* was historically denied[] – ordering defendant to pay benefits up to the date of the judicial determination." Response, p. 12. The United States Supreme Court has found that 29 U.S.C. § 1132(a)(1)(B) permits three specific types of relief: disbursement of accrued benefits, a declaratory judgment that the participant is entitled to benefits under the provisions of the plan contract, and an injunction to prevent the plan administrator from wrongly refusing to pay benefits in the future. *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 147, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). The Court agrees with Defendant that a prospective award of benefits would be speculative. Such an action would not take into consideration, for example, a "miracle cure," an FCE that may include evaluation of its effects on ability to work in any occupation, a review that adequately considers all opinions/historic condition, or an IME that may find Gemmel's disability is solely due to mental illness. Gemmel's request for prospective benefits is not appropriate. However, while recognizing that the Plan Administrator should make a determination whether to terminate benefits in the first instance, *see Saffle v. Sierra Pacific Power Co.*, 85 F.3d 455, 460 (9th Cir. 1996), the Court will issue an injunction that the Plan, through the Plan Administrator, is not to "wrongly refuse" to pay benefits in the future.

*Prejudgment Interest*

Gemmel has requested that the Court order the judgment to include prejudgment interest. Defendant has not objected to this request. "A district court may award prejudgment interest on an award of ERISA benefits at its discretion." *Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007). "Generally, 'the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." *Id*. at 628, *quoting Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163-64 (9th Cir. 2001).

"[I]nterest shall be calculated from the date of the entry of judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System for the calendar week preceding [] the date of the judgment." 28 U.S.C. § 1961(a).[21] The Court finds an award of prejudgment interest is appropriate.

Accordingly, IT IS ORDERED:

1.     Gemmel's Motion for Summary Judgment and Motion for ERISA Determination of Benefits [Doc. # 184] is GRANTED IN PART and DENIED IN PART.

2.     Defendant's Motion for Judgment on the Administrative Record [Doc. # 178] is GRANTED IN PART and DENIED IN PART.

3.     Gemmel is awarded pre-judgment interest on her disability benefits.

4.     Defendant shall provide Basic Life Insurance and Optional Life Insurance coverage as set forth in the Handbook.

5.     Defendant shall reinstate Gemmel to the Plan and pay disability benefits to Gemmel as set forth in the Policy and consistent with the terms of this Order through the

---

[21]*See* www.federalreserve.gov.

present date.

      6.     Judgment is awarded in favor of Plaintiff and against Defendant.

      7.     The Clerk of the Court shall enter judgment and shall then close its file in this matter.

      DATED this 25th day of September, 2009.

Cindy K. Jorgenson
United States District Judge